# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION
## 3:14-cv-625-FDW

| | | |
|---|---|---|
| STACEY WYNN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| FRANK L. PERRY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**THIS MATTER** comes before the Court on Plaintiff's Amended Complaint, (Doc. No. 48), Defendants' Motion for Summary Judgment, (Doc. No. 65), Plaintiff's Response, (Doc. No. 70), and Defendants' Reply (Doc. No. 71).

## I.    BACKGROUND

Plaintiff Stacey Wynn and four other North Carolina inmates incarcerated at the Lanesboro Correctional Institution in Polkton, North Carolina,[1] filed Complaint through counsel on November 7, 2014, alleging that they had been violently assaulted by other inmates at Lanesboro C.I. (Doc. No. 1). The Complaint was served and the Court granted Defendants' motion to sever each of the Plaintiffs' claims into a separate case. (Doc. No. 37). The operative pleading in this case is the Amended Complaint, filed by counsel on March 10, 2017. (Doc. No. 47).

**(1)    Amended Complaint** (Doc. No. 48)

Petitioner names as Defendants the following Lanesboro employees: Administrator Lawrence H. Parsons, Jr., Food Service Manager John Harrington, and Food Service Officer

---

[1] Plaintiff is currently housed at Sampson Correctional Institution, but asserts that he can be transferred back to Lanesboro at any time. (Doc. No. 48 at 4).

Rodney Mauldin, in their individual and official capacities.[2]

Plaintiff alleges that he was assaulted twice by another inmate, Sadat Sanchez, on November 12, 2011, in Lanesboro Union Unit's B-Pod. (Doc. No. 48 at 8). Plaintiff and Sanchez worked in Lanesboro's kitchen together. "Prior to the date of the attacks, Plaintiff advised Defendants Mauldin and Harrington (the kitchen supervisors) about rising tensions between him and Inmate Sanchez, as well as Inmate Sanchez's active stealing from the kitchen cooler." (Doc. No. 48 at 8). Although Mauldin and Harrington "were aware of Inmate Sanchez's violations, and the conflict between Inmate Sanchez and Plaintiff, they took no action to remove Inmate Sanchez from working with Plaintiff in the kitchen, where Inmate Sanchez had access to metal knife-like objects." (Doc. No. 48 at 9). Further, these Defendants "failed to notify other officers responsible for Inmate Sanchez of the risk to Plaintiff." (Id.).

At approximately 7:00 PM on November 12, 2011, Plaintiff left his work in the kitchen and walked back to his cell. As Plaintiff entered his cell, Inmate Sanchez followed and "attacked" him. (Doc. No. 48 at 9). Other inmates came in to break up the fight. (Doc. No. 48 at 9). Due to the fact that there were multiple inmates in Plaintiff's cell, approximately four correctional officers were dispatched to come in and search the cell, but no correctional officer took any action with respect to Plaintiff's "injuries." (Doc. No. 48 at 10).

At around 9:00 PM, that same day Inmate Sanchez "assaulted Plaintiff again as he was walking from his cell down the stairs in his cellblock, however, this time Inmate Sanchez used a weapon resembling a filet knife." (Doc. No. 48 at 10). Inmate Sanchez stabbed Plaintiff in the chest and struck him with a chair. Plaintiff attempted to block the chair, injuring his hand and

---

[2] These titles applied to Defendants at the time of the incident at issue. Parsons and Harrington no longer work at Lanesboro and Mauldin is now a Food Service Manager there.

tearing his rotator cuff. Plaintiff fell to the concrete floor and he and Sanchez continued to struggle, resulting in Inmate Sanchez biting Plaintiff on the arm. (Doc. No. 48 at 10).

Two guards were on duty in that area but they left their post shortly before the attack, and no correctional officers were in the area to observe Inmate Sanchez's attack on Plaintiff. Plaintiff was taken to medical for the laceration to his chest, lacerations to his right forearm, and a severely jammed thumb. Medical staff noted a large amount of bleeding and damaged right shoulder.

Plaintiff was sent to Anson Community Hospital for treatment where he arrived around 10:07 PM. He suffered a 12-centimeter laceration on the chest, and a 12 ½-centimeter laceration to his right forearm. He was treated with morphine, received a total of 47 stitches, was taken for x-rays of his chest and right shoulder, and was told he would receive an MRI at a later date. (Doc. No. 48 at 11).

Upon returning to Lanesboro, Plaintiff was placed in solitary "as punishment for the incident involving Inmate Sanchez." (Doc. No. 48 at 11). He received an MRI on June 4, 2012, which revealed a severe tear to the right rotator cuff for which he had surgery on September 7, 2012. He has attended physical therapy since then. "Upon information and belief, as a result of the wrongful conduct of Defendants, Plaintiff is permanently disabled." (Doc. No. 48 at 11).

Plaintiff was initially charged with a disciplinary infraction for fighting after Inmate Sanchez attacked him, but after an investigation, the Chief Disciplinary Hearing Officer dismissed the charge after viewing a video of the attack. Plaintiff has zero infractions relating to this incident, he is not an STG validated inmate, and he has no gang affiliation. (Doc. No. 48 at 12).

On November 20, 2011, Plaintiff filed a grievance stating that correctional officers failed their obligation to protect him from harm and that he feared for his safety because staff did not find his safety important. On November 28, 2011, Plaintiff filed a grievance for failing to provide

treatment for his shoulder and cruel and unusual punishment. On December 8, 2011, Lanesboro denied his grievance solely because they "did not see anything about a torn rotator cuff in the hospital notes." (Doc. No. 48 at 12). Plaintiff appealed the denials and received no relief.[3]

A number of unsafe conditions at Lanesboro contributed to Inmate Sanchez's attack on Plaintiff. First, security in the kitchens is inadequate. Inmates who work in the kitchen are screened in a change-out room after they complete their shifts, which is equipped with metal detectors. However, the metal detectors are "customarily used improperly," in that "officers will often waive inmates through even if the detectors signal the presence of metal." (Doc. No. 48 at 9). In addition, there is a space adjacent to the metal detectors large enough to allow inmates to walk around the detectors. Inmates "routinely walk around the metal detectors without being searched." (Id.). Lanesboro also has "frequent problems with guards abandoning their posts." (Id.). Lanesboro department heads are responsible for developing and implementing policy that ensure proper storage of tools; knives are considered tools under DAC (Division of Adult Correction) policy. Knives are supposed to be secured and inaccessible to inmates without staff supervision. "However, knives are accessible to inmates at Lanesboro without staff supervision." (Doc. No. 48 at 9). Missing knives are supposed to be reported immediately pursuant to policy, however, "when knives go missing at Lanesboro, they are merely replaced from the stockroom, and are not reported." (Doc. No. 48 at 9).

Second, Plaintiff alleges that Lanesboro as a whole suffers from insufficient security and dangerous conditions. Lanesboro is a "close custody" high security prison with 1,000 cells,

---

[3] It does not appear that Plaintiff is asserting a claim for the denial of his grievances. Even if he had attempted to do so, its dismissal would be required as a matter of law. See Adams v. Rice, 40 F.3d 72, 75 (4th Cir. 1994) ("the Constitution creates no entitlement to grievance procedures or access to any such procedure voluntarily established by a state.").

approximately 514 staff, and an inmate capacity of 1,400. (Doc. No. 48 at 6). Lanesboro was opened in January 2004 "and has been plagued with inmate and staff violence and staff corruption since its inception." (Doc. No. 48 at 6). As a close custody institution, there are strict rules and policies on the controlled movement of prisoners and the regular inspection of cells for contraband. These rules were disregarded in the Union Unit. "On information and belief, the incidents of inmate violence at Lanesboro CI, and in the Union Unit in particular, were much higher than any other closed custody facility in the state's prison system." (Doc. No. 48 at 2).

Third, the Union housing unit where Plaintiff and Sanchez resided, were particularly dangerous. Plaintiff alleges that Union Unit Supervisor Jeffrey Wall deliberately fostered gang violence within Union Unit, was a gang member or personally profited from facilitating gang-controlled contraband economy that flourished in the unit. (Doc. No. 48 at 1). Wall assigned most "Blood"/"UBN" gang members to the E-Pod. (Doc. No. 48 at 2). Wall and his staff allowed gang members to move freely through the unit and in and out of his office in complete violation of DPS prison control policies. His staff opened secured controlled-access doors to allow gang members to enter other pods on the unit to commit acts of retributive violence. Numerous assaults involved contraband metal weapons resembling razors, shanks, knives, ice picks, and similar dangerous weapons.

Defendant Parsons served as the Lanesboro Assistant Superintendent for Custody and Operations beginning March 2010, then was the highest ranking person in the prison when it operated without a superintendent for some time, and he was appointed in August 2012 as Lanesboro Administrator. Parsons he had a duty to report and to take action with respect to threats to inmate safety and violation of prison rules. He was responsible for the management and control of Lanesboro, and for the selection, training, assignment, placement, promotion, and discipline of

the uniformed staff of Lanesboro. He was also responsible for issuing and enforcing policies and procedures of searching inmates and staff for contraband and weapons. Parsons was "personally aware of the threat posed to Plaintiff as a result of Union Unit employees routinely disregarding prison policies designed to ensure the safety of inmates." (Doc. No. 48 at 5). "Upon information and belief, Defendant Parsons was aware of the attacks on inmates that preceded the attack on Plaintiff, he was notified when Plaintiff was attacked, and he was notified about subsequent attacks in Union Unit." (Doc. No. 48 at 5).

Parsons failed to protect Plaintiff from a pervasive risk of harm from assault by other inmates with contraband weapons. He was aware that a substantial risk of inmate attacks was longstanding and pervasive, and well-documented. The circumstances suggest that he was personally notified by multiple inmate grievances and detention officers about the pervasive well documented risk." (Doc. No. 48 at 5). Parsons was indifferent to regular reports showing higher levels of serious inmate violence at Lanesboro, particularly Union Unit, as compared to other DPS close prisons. He failed to investigate the cause of those statistics and allowed Wall to maintain a "violent, contraband-driven fiefdom." (Doc. No. 48 at 2). Parsons knew from talking to injured inmates that their attackers had been allowed by Union staff to possess weapons, leave their cell pods, pass through controlled secured doors opened by staff, and to enter other pods in Union Unit to commit these attacks; such movements were in complete violation of prison rules. Parsons knew from reports from detention officers that gang culture had infiltrated management and supervision of Union Unit, and he did nothing with that information. (Doc. No. 48 at 2-3). Parsons knew that most of the inmates committing assaults were designated as STG members by DPS. (Doc. No. 48 at 3). Parsons knew that Wall housed Bloods gang members in the E-pod. He also knew that cell phones and other contraband were freely available inside Union unit, a market controlled by Wall

and the Bloods gang. Parsons knew that the weapons used in attacks largely had been taken from the kitchen and that inmates were walking around the metal detector set up in the kitchen to prevent the removal of metal that could be used as weapons in complete violation of prison rules.

Parsons knew via complaints from Captain Covington and repeated violent attacks, which culminated in the stabbing death of Inmate Wesley Turner in September, 2012, that Union Unit was not being safely managed by Unit Manager Wall. Instances of inmate on inmate violence, inmate grievances, reports from detention officers, other reports show longstanding, pervasive, well-documented pattern of inmate attacks that was sufficient to give Defendants actual knowledge of the risk faced by those in their custody. The high rate of violent incidents at the Union Unit relative to other prison facilities across the state, particularly other close custody facilities, was "more than sufficient to put defendant officials on notice as to the unit's unconstitutional conditions." (Doc. No. 48 at 8). Longstanding, pervasive and well-documented pattern of attacks on inmates at Lanesboro demonstrated a constant threat of violence in Lanesboro that placed all inmates at risk of harm known to individual detention officers, supervisors and administrators. "Plaintiff's stabbing was actively facilitated by correctional officers under Mr. Wall's command and an inmate in Wall's custody." (Doc. No. 48 at 12). "In enabling this attack, each of these officers acted in accordance with defendant officials' unlawful policy of permitting favored gang members in the Union Unit to routinely violate prison rules, including those prohibiting inmates from possessing weapons." (Doc. No. 48 at 12).

Defendant Parsons was notified following the attack on Plaintiff pursuant to routine procedures but took no action to make Union Unit more secure by removing the detention officers such as Unit Manager Wall who were collaborating with inmate-gang members to facilitate the attacks on inmates. (Doc. No. 48 at 12). "The high rate of violent incidents in Lanesboro's Union

Unit relative to other prison facilities across the state, particularly other closed custody facilities, was more than sufficient to put defendant officials on notice as to the unit's unconstitutional conditions." (Doc. No. 48 at 13). "Defendant officers and officials actively conspired to conceal their illegal and unconstitutional conduct by reporting the attacks on Plaintiff as incidents of mutual combat, denying Plaintiff proper medical attention for the significant wounds he suffered to his chest and shoulder, and wrongfully and deliberately disciplining them for violating prison rules in being stabbed by persons from outside their cells." (Doc. No. 48 at 13).

Parsons was willfully and deliberately indifferent to Plaintiff's safety by: failing to notify other appropriate correctional staff when Plaintiff notified Defendants of his safety concerns; allowing and/or providing inmates access to metal knife like weapons, or shanks; willfully and deliberately allowing Sanchez to leave the kitchen and other areas in the prison with knives and metal knife-like weapons, either by bypassing metal detectors or not searching when the detector alarmed, thus allowing Sanchez to engage in violence in the facility; allowing Sanchez to possess forbidden metal weapons; refusing to move Plaintiff after Defendants were put on notice by Plaintiff's legitimate safety concerns and/or were put on notice of Plaintiff's safety concerns; failing to adequately intervene to prevent serious bodily injury once Plaintiff was attacked; and charging Plaintiff with disciplinary infraction when he was attacked while knowing he was innocent of an assaultive infraction.

Rodney Mauldin worked in the kitchen at Lanesboro during the relevant time. As an employee of the prison, he had a duty to report and to take action with respect to threats to inmate safety and violation of prison rules.

John Harrington was the kitchen supervisor during the relevant time. As an employee of the prison, he had a duty to report and to take action with respect to threats to inmate safety and

violation of prison rules.

Defendants violated due process by failing to protect Plaintiff's right to be free from physical injury, and the rights to bodily integrity and privacy. (Doc. No. 48 at 16). Parsons, by his policies, practices, acts and omissions, deprived Plaintiff of due process right to be free from physical injury and bodily integrity and privacy. Defendant employees also deprived Plaintiff of due process right to be free from physical injury, bodily integrity, and privacy.

Plaintiff claims that he exhausted his claims by filing grievances regarding the assault setting forth Defendants' deliberate indifference. He was denied relief. (Doc. No. 48 at 16).

Plaintiff seeks declaratory judgment, injunctive relief, compensatory and punitive damages, costs, attorney's fees, a jury trial, and such other relief as the court deems just and proper.

**(2)      Defendants' Motion for Summary Judgment** (Doc. Nos. 65, 66)

Defendants seek summary judgment because Plaintiff fails to state a claim for failure to protect, failure to intervene, disciplinary charges, supervisory liability, or deprivation of privacy. Moreover, Defendants are entitled to qualified immunity.

Plaintiff fails to state a claim for failure to protect because there is no evidence that Defendants actually knew and disregarded a substantial risk of serious injury posed to Plaintiff by Inmate Sanchez. Plaintiff's alleged report of "rising tensions" to Defendants Harrington and Mauldin, even if true, did not put Defendants on notice of a substantial risk of harm to Plaintiff by Sanchez. Defendants swear under oath that a report of "rising tensions" by Plaintiff with Sanchez would not have triggered any concern that placing Plaintiff in protective custody was warranted or that his safety was in jeopardy.

Plaintiff also fails to show that Defendants possessed a sufficiently culpable state of mind for deliberate indifference. Plaintiff never alleges that Defendant Parsons was ever aware that

Sanchez posed a threat to Plaintiff's safety. Instead, Plaintiff avers that Parsons was aware of various violations of prison policy by Unit Manager Jeffrey Wall that presumably should have placed Parsons on notice of a general risk of harm to the entire inmate population. This falls short of the knowledge standard. Assuming Parsons knew Lanesboro was dangerous generally, a history of inmate assaults in other areas involving inmates other than Plaintiff would not reasonably put notice that Plaintiff was exposed to a substantial risk of harm from Sanchez on November 12, 2011. Plaintiff complains about gang members in E-Pod but Plaintiff and Sanchez were both assigned to B-Pod. Even if Parsons was aware that inter-pod access policies were being violated, this had nothing to do with Sanchez's access to Plaintiff.

Plaintiff took no steps to seek assistance besides his reports to Mauldin and Harrington of "rising tensions" at some point before November 12, 2011. He never sought protective custody before November 12, 2011, or after the alleged first attack earlier that day. Plaintiff never submitted a grievance before November 12, 2011, complaining of fear for his safety from Sanchez or anyone else. Plaintiff failed to put Defendants on notice of any specific risk of harm posed to him by Sanchez on or before November 12, 2011, so they could not have reasonably perceived such a risk.

With regards to failure to intervene, Plaintiff does not allege any Defendant was present when Plaintiff was attacked so they could not have intervened to prevent Plaintiff's injuries.

With regards to disciplinary charges, none of these Defendants was responsible for charging Plaintiff with a disciplinary action when he was attacked. The incident occurred in the housing unit, not the kitchen where Harrington and Mauldin worked. Parsons did not charge Plaintiff with any infraction or participate in the disciplinary process at Lanesboro. In any event, the disciplinary charge was ultimately dismissed so Plaintiff suffered no disciplinary consequences

as a result of his altercation with Sanchez.

Plaintiff's claim that he was deprived of due process under the Fourteenth Amendment is inappropriate because, with the narrow exception of privacy regarding genitals, the Eighth Amendment, rather than Fourteenth Amendment, is the primary constitutional limitation associated with a prisoner's bodily integrity. Plaintiff does not allege any sexual assault so a Fourteenth Amendment analysis is inappropriate.

Plaintiff has failed to state a clear claim of supervisory liability against Parsons. To the extent he alleges Parsons is liable as supervisor of Mauldin and Harrington, he fails to allege a constitutional violation by either of those people, or any basis on which Parsons knew or should have known they were violating Plaintiff's rights. A single incident is not sufficient; there must be widespread and documented abuse. Parsons cannot be held responsible for Jeffrey Wall's conduct because Wall is not a party. Plaintiff cannot support his assertion that Parsons should be held liable as a supervisor because he cannot prove Parsons was aware of a transgression by a subordinate that was a constitutional violation that he tacitly authorized. The allegations that Plaintiff's claims put Parsons on notice of a danger to him by Sanchez did not include any specific threat Plaintiff felt Sanchez posed to him, or any knowledge by Parsons that Sanchez presented a risk of physically assaulting Plaintiff.

Defendants are entitled to qualified immunity. Mauldin's and Harrington's alleged individual conduct was objectively reasonable in light of constitutional requirements. The Eighth Amendment does not require them to predict assault by Sanchez which, if undertaken, would pose a risk of harm to Plaintiff. At most, they knew there were "rising tensions" between the two. There is no evidence that they had any reason to believe Sanchez posed a threat to Plaintiff's safety. Both inmates were good kitchen workers and neither ever caused a problem in the kitchen. What

Plaintiff claims to have told Mauldin and Harrington is not the type of info that would reasonably lead corrections officers to take action to prevent an assault. "Rising tensions" is vague and no reasonable officer in Mauldin's and Harrington's positions would have believed further action to protect Plaintiff was require or that failure to take such action would violate Plaintiff's constitutional rights. Plaintiff failed to demonstrate that Parsons ever had a subjective or objective reason to believe Sanchez posed an unreasonable risk of harm to Plaintiff. In the absence of specific knowledge of a specific risk posted Plaintiff by Sanchez, Parsons could not have understood that his failure to act exposed Parsons to liability or jeopardized Plaintiff's constitutional rights. Whatever level of knowledge Parsons had generally about risks to inmates at Lanesboro generally due to previously reported assaults, the fact that Plaintiff was subsequently injured in an assault does not impute notice to Parsons before the assault that any inaction by him was unlawful.

**(3)** **Plaintiff's Response** (Doc. No. 70)

Summary judgment should be denied because genuine issues of material fact remain as to each Defendant's liability for their deliberate indifference to Plaintiff's safety with respect to the known pervasive risk of inmate on inmate violence at Lanesboro, and policies that Defendants did not follow which allowed this pervasive risk to continue and eventually led to Plaintiff's stabbing.

Prison officials are liable for violence against inmates under the Eighth Amendment when they deliberately disregard a known pervasive risk of harm. A plaintiff can rely on circumstantial evidence to show deliberate indifference. Defendants misstate the law by asserting that constructive knowledge does not suffice; circumstantial evidence of a pervasive risk is sufficient to show actual knowledge. Prison officers and administrators are liable for the attack on Plaintiff because they knew of the pervasive risk of attack against inmates and disregarded the risk by

failing to follow procedures established for inmate safety.

Defendants had actual notice of the risk of harm to Plaintiff. Defendants Mauldin and Harrington had actual notice of significant history of attacks and assaults at Lanesboro, in addition to actual notice of the threat of harm to Plaintiff. Plaintiff alerted Mauldin and Harrington of the specific risk of harm he faced from Sanchez, an STG validated inmate who was permitted to work in the kitchens. Plaintiff told Mauldin and Harrington of "rising tensions" between himself and Sanchez. Following the stabbing, Lanesboro changed its policies re STG validated inmates – they are no longer allowed to work in the kitchen where they have access to knives and other utensils. Defendants Parsons and Harrington stated that utensils would occasionally go missing and were not always recovered.

Defendants knew of pervasive risk of inmate on inmate violence at Lanesboro. Circumstantial evidence to find deliberate indifference include: Plaintiff's statements to Defendants; well-documented history of pervasive and constant attacks at Lanesboro; consistent non-adherence to security policies; reported complaints and concerns regarding inmate safety and contraband within Union Unit. (Doc. No. 70 at 12). Assaults at Lanesboro were pervasive, well-documented, expressly noted by guards and prison officials. Parsons recalls 50-100 stabbings in his three-year term at the prison. In his deposition, Parsons admitted the assaults within Union Unit were so numerous that he could not recall the specifics of most of them. The assaults were known to everyone because a PA announcement went out every time there was a disturbance. Everyone on staff at Lanesboro carried a radio to call and receive codes in the event of an altercation as specifically proscribed by prison security policies and procedures. Parsons was responsible for reviewing each incident report and had first-hand knowledge of the details of the assaults and their frequency. It was known to Defendants that assaults were especially prevalent and pervasive in

Union Unit where Plaintiff and Sanchez were both housed, and that assaults often occurred with the knowledge, and sometimes facilitation of correctional officers. Detention officers notified Parsons of the pervasive risk of harm in Union Unit. It was widely known that some officers had reputations for being involved in gangs and some officers had been investigated. According to Mauldin, Lanesboro was beginning to gain a reputation within DPS as having more gang members and "rotten eggs."

SBI conducted numerous investigations into assaults at Lanesboro and Union Unit but Parsons continually defended the Union Unit Manager, Jeffrey Wall, who was later found to have hidden a bag of knives, shanks, and security footage in the ceiling of his office. Parsons knew the administrator of Lanesboro prior to him, Richard Neely, was removed from his post and indicted in 2011 for obstructing justice after he destroyed security footage of an assault on an inmate. Following Neely's removal, another 20 officers were removed for bringing contraband into the prison. Parsons agreed that Lanesboro has more problems than other prisons in North Carolina. He acknowledged that he inherited a prison where officers were bringing in significant contraband and with a significant degree of inmate violence using contraband weapons. Defendants knew of frequent attacks, widespread corruption, and dangerous contraband, which demonstrate the longstanding, well documented and pervasiveness of risk of substantial harm within Lanesboro. Defendants deliberately failed to follow procedures which would have protected inmates. Deliberate indifference can be shown by officials' failure to properly follow and enforce prison safety policies and procedures. Parsons was asked "if people had followed those procedures, then it could have kept weapons, drugs, and cell phones out of Lanesboro," he said yes. Parsons had direct knowledge of the pervasiveness of contraband within the prison, and also had received complaints from other corrections officers re inmate safety within Union Unit, yet he failed to take

any action to address these issues.

Defendants knew there were frequent attacks at Lanesboro and there were a large number of knives and other sharp weapons throughout the prison; despite that knowledge, Defendants continued to breach security policies and Parsons failed to take advantage of the significant resources at his disposal such as hand-held metal detectors, cell-sense tower, and PERT team specifically designed to protect inmate safety. Metal detectors outside the kitchen were not supervised correctly and often inmates were left without supervision in clear violation of established policy. The Prison Emergency Response Team was responsible for conducting specialized prison-wide shakedowns and was available to Parsons whenever he called them to the prison.

Specific policies and procedures are in place for confiscating and storing weapons after assaults but these were repeatedly disregarded. As prison administrator, Parsons was responsible for reviewing all incident reports to ensure policies and procedures had been followed, but he approved reports in which it was not clear that adequate searches had been performed to recover the weapons involved.

Officers were required to perform daily shakedowns of cells to ensure contraband was not getting past metal detectors but these searches did not occur according to policy and no individual inmate's cell was searched daily. Parsons had direct knowledge of these failings yet did not take any action.

All three Defendants acknowledged that dangerous contraband made its way into the prison, speculated as to how that happened, and yet did nothing to address the problem. Parsons said he understood that the policies and procedures at Lanesboro were put into place to keep inmates and detention officers safe. Parsons had a duty to train officers and review their

performance re how to keep the inmates in their care safe. Parsons turned a blind eye when policies were not followed; the policies could make the prison safer for inmates and officers. Mauldin and Harrington did not follow procedures despite knowing that inmates were worried for their safety and that assaults were commonplace. Parsons knew the policy of searching for contraband weapons involved in inmate incidents and assaults was continuously disregarded: if there is ever an incident with an inmate involving contraband, especially a weapon, it is confiscated, labeled, and placed in a locker until it is evaluated by a Disciplinary Hearing Officer. Parsons knew this procedure was not followed as it should have been; rather than conduct an exhaustive search for the weapon used, Parsons said "if they threw it or hid it or did something to distract us, I mean, to hide the thing or give it to somebody else, that's beyond our control." Despite numerous security resources at his disposal, Parsons and the corrections officers he was responsible for training routinely failed to confiscate contraband weapons following inmate assaults. Only if they had a weapon and we saw it would corrections officers confiscate it. This was what happened with Plaintiff. In the incident report, it acknowledges a weapon was used and not recovered and makes no mention of a search or any other effort to recover the weapon at all. Parsons says he does not know why they didn't find the weapon, and that it was Unit Manager Wall's responsibility. Missing knives, shanks, and security footage dating back to 2006 were found hidden in a box in Wall's office ceiling; this is an example of willful disregard for a known risk and deliberate indifference towards that risk; this illustrates Parsons' deliberate indifference towards the supervision and training of Wall.

Policies and procedures regarding reporting and charging inmate assaults were also routinely disregarded. Parsons was aware of Wall's practice of over-charging inmates who were the victims of assaults. Plaintiff was originally charged with a C4 physical altercation charge.

Before the report was submitted to the DHO, Wall increased the charge to an A10 assault charge. Plaintiff was found guilty, but when he appealed to Raleigh it was dismissed because the evidence showed he was a victim. This was the same evidence Parsons reviewed when he approved the A10 charge. Parsons said in his deposition that when an inmate is an unarmed v defending himself, they should not be charged at all. This failure to adhere to policies and procedures served to punish inmates who were attacked and discourage full investigation into complaints.

Defendants have misstated the deliberate indifference standard in their motion for summary judgment. They say constructive knowledge does not suffice, but admit that knowledge can be proven through circumstantial evidence. Defendants claim that their failure to appropriately perceive the risk to Plaintiff's safety absolves them from civil liability. Discrete knowledge of a potential risk of harm is not required for Ds to be held liable under the Eighth Amendment. Defendants also incorrectly allege there is no dispute of material fact where they are actually numerous disputes regarding: whether kitchen shakedown policy was not regularly followed; whether SOP was often disregarded and inmate were regularly left unsupervised and able to smuggle contraband in and out of the kitchen; Defendants contradict themselves regarding whether utensils went missing; Defendants say Plaintiff never alerted them to rising tension between himself and Sanchez, and STG inmate, but indirectly contradict themselves by saying that even if Plaintiff had alerted them to the rising tensions between himself and Sanchez, he failed to put Defendants on notice of any specific risk posed to him by Sanchez – this contradicts Plaintiff's allegations of his report to Mauldin and Harrington coupled with the longstanding and pervasive nature of inmate assault at Lanesboro.

Parsons attempts to avoid supervisory liability by saying he did not know of Wall's actions and there is nothing in the record that points to constitutional violations by Wall. However, Wall

was originally named in the complaint and Plaintiff made specific allegations against him. Parsons acknowledges in his deposition that Unit Manager Wall had been investigated by SBI and overcharged Plaintiff with a disciplinary infraction, and yet Parsons continued to defend him as a good employee even after he was fired for facilitating inmate assaults and after the bag was found in his ceiling.

Defendants violated clearly established constitutional right through their deliberate indifference to his security and are not entitled to qualified immunity. Specific knowledge of the specific risk to an inmate is not required. Mauldin and Harrington were alerted to the "rising tension" between Sanchez and Plaintiff, knew of the pervasiveness and regularity of inmate assaults at Lanesboro, and Parsons was responsible for reviewing all incident reports and training his officers on the policies/procedures for adequately protecting inmates' health and safety. Defendants' failure to protect Plaintiff from assault violated his clearly established Eighth Amendment rights. Given the well-publicized history of litigation around the Eighth Amendment and the rights of inmates, Defendants are not absolved from liability simply by claiming they failed to infer the risk to P or that they did not know their actions violated the Eighth Amendment.

**(4)** **Defendants' Reply** (Doc. No. 71)

Constructive knowledge can be proven through circumstantial evidence such as substantial evidence of inmate attacks was longstanding, pervasive, well-documented or expressly noted by prison officials in the past. However, Plaintiff's attempts to create a genuine issue of material fact, especially with regards to Defendants Mauldin and Harrington, are based on argument, overgeneralizations, and inaccuracies.

Plaintiff says Defendants were all aware of the large number of assaults, yet Defendant Mauldin never testified about the number of assaults at Lanesboro or his knowledge of them.

Plaintiff's assertion about prevalent violent assaults at Union Unit is supported by Defendant Mauldin's deposition referring to the 2012 murder of Turner, which occurred after Plaintiff's incident, and has no factual support. Nothing supports Plaintiff's contention that Defendants Mauldin and Harrington failed to supervise the kitchen property and report when they knew other officers were not following security procedures. Plaintiff's affidavit never asserts that Defendants Mauldin and Harrington were responsible for searching inmates or operating the metal detectors.

Plaintiff's affidavit also contains irregularities: there are handwritten strikethroughs and additions; it is dated November 27, 2017, after Defendants Mauldin and Harrington had been deposed and more than four weeks before Defendants filed the motion for summary judgment; it only mentions Defendants Mauldin and Harrington by name four times; it contradicts the allegations in the amended complaint regarding the type of knife used by Sanchez and appears to try to conform with Mauldin's testimony that Lanesboro did not have filet knives. Plaintiff has no evidence and makes no assertion that Inmate Sanchez ever handled knives in the kitchen or was given access to one by Defendants Mauldin, Harrington, or anyone else. Plaintiff has propensity to exaggerate facts and alleged connections between them.

The Response argument says that Defendants Mauldin and Harrington had actual notice of significant history of attacks at Lanesboro and that, following Plaintiff's stabbing, they prohibited gang validated inmates from working in the kitchen. Plaintiff implies that his assault caused the policy changes, but the evidence shows the changes only happened over the last two years, around 2015. Defendant Harrington testified that Lanesboro programs staff had final say over who worked in the kitchen, both prior to the policy change and afterwards. With regards to Defendants' knowledge of pervasive risk because utensils would periodically go missing. Yet neither Defendant Parsons nor Harrington testified that way. Defendant Harrington said they do not go

back to housing until the utensil is found. Defendant Parsons said searches happen when items go missing.

Virtually nothing connects Defendant Harrington or Mauldin to "knowledge" of well documented history of pervasive and constant attacks, along with reported complaints and concerns about inmate safety. "Codes" are called over the prison's PA system and radios of staff that receive code calls. Code 4 covers inmate on inmate violence as well as fighting, arguing, or any other disturbance requiring staff response. There is no evidence that food service officers like Mauldin and Harrington must have known about those incidents and they, in particular, are entitled to summary judgment.

With regards to the inapplicability of supervisory liability regarding Defendant Parsons, the original Compliant has no bearing because it has been superseded by the Amended Complaint. Defendant Parsons' deposition regarding knowledge relating to Union Unit Manager Jeffrey Wall is irrelevant because Wall is not a defendant in this action and Defendant Parsons did not testify that he knew of Wall's criminal conduct before Plaintiff was attacked. The Amended Complaint reveals that the SBI did not investigate until after Inmate Wesley Turner's murder in September, 2012. The contention that Defendant Parsons' recollection of events nine months after Plaintiff's attack tries to imply Defendant Parsons knew of Wall's misconduct before November, 2011, and should be disregarded.

**(5)    Evidence**[4]

**(A)    Plaintiff's Affidavit** (Doc. No. 66-4)

At the time of the incident, Plaintiff was housed at Lanesboro's Union Unit dormitory that was managed by Jeffrey Wall. (Doc. No. 66-4 at 1). Plaintiff was assigned to work in the kitchen

---

[4] This section is not exhaustive and, in particular, excludes documents filed under seal.

where he was responsible for storing food, delivering it to the cooks, and keeping inventory of the tools used during a shift. Once kitchen shifts are complete, inmates return to the locker rooms. There is a metal detector directly across from the kitchen exit. Inmates are to walk through the metal detector on their way back to the locker rooms at the end of each shift. The metal detectors do not always function properly and officers sometimes wave inmates through even if the detectors signal the presence of metal. There was a space adjacent to the metal detectors that is large enough to allow inmates to walk around them entirely. Inmates would often walk around the metal detectors without being searched. The majority of the days Plaintiff worked, most of the inmates who worked in the kitchen were permitted by staff to circumvent the metal detectors. Inmates were routinely allowed by staff to walk around the metal detector both when entering and leaving the kitchen. Defendants Mauldin and Harrington were among the officers assigned to the kitchen as supervisors.

Knives are considered tools to be counted with the other inventory in the kitchen. Knives are supposed to be secured and inaccessible to inmates without supervision. When knives go missing they are supposed to be reported immediately (Doc. No. 66-4 at 2). When knives went missing, instead of being reported, they would be replaced from the stockroom.

On November 12, 2011, Plaintiff was working in the kitchen with Inmate Sanchez, who is a known gang member. Inmate Sanchez would often neglect his duties in the kitchen and only fix food for himself and his friends. "Prior to November 12, 2011," Plaintiff told Defendant Mauldin and Defendant Harrington of Inmate Sanchez's actions. (Id.). Plaintiff "**advised Defendants Mauldin and Harrington of the rising tensions between Inmate Sanchez and myself. I asked Defendants Mauldin and Harrington to address the situation**." (Id.) (emphasis added).

At approximately 7:00 PM on November 12, 2011, Plaintiff left work in the kitchen and

returned to his cell in Union Unit. As Plaintiff entered his cell, Inmate Sanchez followed Plaintiff into the cell and proceeded to attack him. Several other inmates entered Plaintiff's cell to break up the fight. Approximately four correctional officers were dispatched in response to the attack, but none of them took any action in response to Plaintiff's "injuries." (Id.).

Later that same evening of November 12, 2011, at approximately 9:00 PM, Inmate Sanchez attacked Plaintiff again while Plaintiff was walking from his cell down the stairs in his cell block. During this second attack, Inmate Sanchez stabbed Plaintiff with what resembled a "fillet knife" commonly found in the kitchen. (Id.). Inmate Sanchez stabbed me with the knife just below his right breast. Inmate Sanchez also hit Plaintiff with a chair. Plaintiff attempted to block the chair from striking him and, in the process, injured his right hand and tore his rotator cuff. Plaintiff fell to the concrete floor and continued to fight off Inmate Sanchez.

There were supposed to be two guards on duty in this area at the time Inmate Sanchez attacked Plaintiff, but they left their post just before the attack began. There were no officers in the area to observe Inmate Sanchez attack Plaintiff or to protect him from the attack. Following the assault, Plaintiff was taken to the medical area within Lanesboro. Plaintiff had a laceration to his, two lacerations on his right forearm, and a severely jammed finger. Lanesboro medical staff noted a large amount of bleeding and a damaged right shoulder. Due to the severity of Plaintiff's injuries, he was transferred to Anson Community Hospital for treatment, where he arrived at approximately 10:07 PM.

As a result of the attack, Plaintiff suffered a twelve-centimeter linear subcutaneous laceration to his right chest, which required fourteen nylon sutures and six subcutaneous sutures. He also suffered a twelve-and-a-half centimeter linear subcutaneous laceration to his right forearm that required nineteen nylon sutures and eight subcutaneous sutures. He was treated with morphine

and was given more than 50 sutures as a direct result of Inmate Sanchez's attack.

Upon returning to Lanesboro, Plaintiff was immediately paced in solitary confinement as punishment for the incident. On June 4, 2012, he received an MRI on his right shoulder for the injuries he sustained during the attack. The MRI showed a complete tear of the rotator cuff. On September 7, 2012, he underwent surgery to repair his shoulder injuries and he has since had to attend regular physical therapy sessions.

Plaintiff was initially charged with a disciplinary infraction for the incident, but once an investigation was completed, the Chief Disciplinary Hearing Officer told Plaintiff the infraction had been dismissed. Plaintiff received no disciplinary infractions because of the incident and he has only one infraction on his entire record, relating to a library book. Plaintiff has no gang affiliations.

On November 20, 2011, Plaintiff filed a grievance stating officers failed to protect him from an attack and that he feared for his safety within the prison. On November 28, 2011, Plaintiff filed a grievance for failure to provide treatment for his shoulder regarding his need to see a specialist and concern that his shoulder would become more damaged without proper treatment. Plaintiff remains disabled as a result of the attack.

On December 8, 2011, Lanesboro officials denied his grievance because they did not see anything about a torn rotator cuff in the hospital notes. Plaintiff appealed and received no relief.

**(B)** **Defendant Harrington's Affidavit** (Doc. No. 66-1)

Defendant John Harrington was the Food Service Manager at Lanesboro at the time of the alleged incident. (Doc. No. 66-1 at 1). As food service manager, his job responsibilities were generally limited to overseeing and supervising the inmate workers in the preparation of meals served during his shift, the cleanup, and inventorying the tools, utensils and knives needed to

prepare meals. (Doc. No. 66-1 at 2).

In the months leading up to and during November 2011, Plaintiff worked in the kitchen as the diet cook and in the supply room. (Doc. No. 66-1 at 2). Inmate Sadat Sanchez also worked in the kitchen with Plaintiff, and performed several jobs including janitor, in the dish room, and on the serving line. (Doc. No. 66-1 at 2).

The first Food Service Officer to come on duty in the kitchen must inventory the utensils and knives and check off the inventory sheet after determining each utensil is accounted for. (Doc. No. 66-1 at 2). All tools, utensils and knives are marked with unique numbers. Inmates working in the kitchen were supervised at all times by two or three Food Service Officers and the Food Service Supervisor. (Doc. No. 66-1 at 2). Harrington did not have any job duties in the housing units or in any other parts of the prison, and did not serve as custody staff. He also did not determine who worked in the kitchen, as those work assignments were made by program staff. (Doc. No. 66-1 at 2).

Lanesboro's Standard Operating Procedure ("SOP") established security practices and procedures to be used in the kitchen and with respect to the inmates working there. (Doc. No. 66-1 at 2). Before beginning work, inmates working in the kitchen gathered in a group and entered the "shakedown" room where they would change into their work uniforms and were searched by custody officers for contraband. (Doc. No. 66-1 at 2-3). After being searched in the shakedown room, inmates passed through a metal detector manned by two custody officers, cross a hallway, then enter the kitchen where they began their work assignments. (Doc. No. 66-1 at 3). If an inmate's work assignment required the use of any utensils or tools to help prepare or serve meals, a Food Service Officer issued them to the inmate. The issuing officer would mark the inventory sheet with the number of the tool/utensil issued and the name of the inmate. (Doc. No. 66-1 at 2).

When the inmate finished with the tool/utensil issued to him, he had to return it to a Food Service Officer, who manually placed it back in its assigned position in the cabinet and marked the inventory sheet to document its return. Harrington did not conduct any searches in the shakedown room or operate the metal detector. (Doc. No. 66-1 at 3).

During Harrington's entire tenure working at Lanesboro CI's kitchen, there was only one time a utensil (a serving spoon) was discovered to be missing at the end of a shift. On that occasion, every inmate worker, the Food Service Officers, and the Food Service Supervisor looked for the utensil until it was found. (Doc. No. 66-1 at 3).

The security of knives in the kitchen is even stricter. All knives are kept in a designated, locked cabinet inside the tool closet. Inmates do not have access to the locked knife cabinet. Only two inmates in any kitchen shift are allowed to use knives: a cook and a prep cook. There are three types of knives in the kitchen. (Doc. No. 66-1 at 3-4). If one of the inmates asked a Food Service Officer for a knife, that officer would unlock the tool closet and the knife cabinet and retrieve a knife and a lockable tether. The officer would document which inmate got what knife and mark the inventory sheet. The officer tethered the knife to the inmate's work station and locked the tether; only then would the inmate be given possession of the knife. (Doc. No. 66-1 at 4). When an inmate finished with a knife, a Food Service Officer would take the knife, unlock the tether, take the knife to be sanitized, then return it to the locked cabinet and mark the inventory sheet. (Doc. No. 66-1 at 4).

There has never been a knife missing from the kitchen while Harrington was working, and he has never heard of a knife going missing from the kitchen during any shift he was not working. There has never been a knife that went missing from Lanesboro C.I. kitchen during his tenure and certainly not during any shift he was working. He did not give Sanchez a knife to take from the

kitchen, nor did he allow Sanchez to take a knife from the kitchen. (Doc. No. 66-1 at 4). No inmate worker was allowed to leave the kitchen until all tools, utensils, and knives had been inventoried and accounted for. Once that process was complete, the inmates were released in small groups to the shakedown room. (Doc. No. 66-1 at 4). On entering the shakedown room, custody officers are expected to direct inmates through the metal detector. After that, they are expected to strip search the inmates for contraband. Only after every inmate is subjected to that process are they released as one group from the shakedown room to return to their housing units. (Doc. No. 66-1 at 5).

Harrington is aware that Plaintiff alleges that he informed Harrington of "rising tensions" between him and Sanchez at some point prior to November 12, 2011, and that Plaintiff claims he reported to Harrington that Sanchez was stealing food items from the Lanesboro C.I. kitchen. Harrington states that he "never had any such conversations with Plaintiff." (Doc. No. 66-1 at 5). Neither Sanchez nor Plaintiff ever caused any problems in the kitchen. To Harrington's knowledge, neither Plaintiff nor Sanchez received any disciplinary action due to conduct occurring in the kitchen and he never personally had to discipline Plaintiff or Sanchez for any conduct occurring in the kitchen. (Doc. No. 66-1 at 5). Harrington further states:

> Plaintiff never informed me, verbally or in writing, that he was afraid of Sanchez, that he believed his safety was in jeopardy at the hands of Sanchez, or that he needed protective custody because of a threat from Sanchez. Even if Plaintiff told me of 'rising tensions' between him and Sanchez, I would not have interpreted that as a threat of physical harm to Plaintiff. To the contrary, Plaintiff and Sanchez were good workers who did not appear to have any problems with each other.

(Doc. No. 66-1 at 5).

Harrington denies that he has "ever knowingly or willfully acted in any manner intended to deprive Plaintiff of any right secured to him under the laws of the State of North Carolina or the Constitution of the United States." (Doc. No. 66-1 at 5).

**(C)** **Defendant Mauldin's Affidavit** (Doc. No. 66-3)

Defendant Mauldin is presently employed as Food Service Manager at Lanesboro CI, and worked there as a Food Service Officer in November, 2011. (Doc. No. 66-3 at 1). As a Food Service Officer, his responsibilities were generally limited to overseeing and supervising the inmate workers in the prep of meals served during his shift and ensuing cleanup, as well as inventorying the tools, utensils, and knives needed to prepare meals. (Doc. No. 66-3 at 2). The first Food Service Officer to come on duty must inventory the utensils and knives and check off the inventory sheet after determining each utensil is accounted for. All tools, utensils, and knives are marked with unique numbers to maintain accountability. (Doc. No. 66-3 at 2). Inmates who worked in the kitchen were supervised at all times by two or three Food Service Officers and the Food Service Supervisor. Mauldin did not have any job duties in the housing units or any other parts of the prison and did not serve as custody staff. (Doc. No. 66-3 at 2). As a Food Service Officer, Mauldin did not determine who worked in the kitchen, as those work assignments were made by programs staff.

Lanesboro CI had a SOP establishing the security practices and procedures to be used in the kitchen and with respect to the inmates who worked there. (Doc. No. 66-3 at 2). Prior to beginning work, inmates who worked in the kitchen gathered in a group and entered the shakedown room where they would change, be searched for contraband. (Doc. No. 66-3 at 3). As a Food Service Officer, Mauldin did not conduct any searches in the shakedown room or operate the metal detector. Once the searches in the shakedown room were completed, the inmates passed through metal detector manned by custody officers, then entered the kitchen. (Doc. No. 66-3 at 3). He described the procedure for checking out utensils and documenting their return.

During Mauldin's entire tenure in Lanesboro CI's kitchen, there were two utensils that

were lost; a serving spoon and a spatula. The incidents were reported, searches were conducted, and they were never found; this happened long after Plaintiff stopped working in the kitchen. (Doc. No. 66-3 at 3). Mauldin explained that the security with knives is even stricter than for utensils, and explains the procedure for securing and documenting knives. (Doc. No. 66-3 at 3).

Mauldin is aware that Plaintiff has alleged he informed Mauldin of "rising tensions" between him and Sanchez at some point prior to November 12, 2011, and that he claims to have reported to Mauldin that Sanchez was stealing food items from the Lanesboro CI supply room. Mauldin states that he "never had any such conversations with Plaintiff." (Doc. No. 66-3 at 5). Neither Inmate Sanchez nor Plaintiff ever caused any problems in the kitchen and, to his knowledge, neither of them received any disciplinary action due to conduct occurring in the kitchen. (Doc. No. 66-3 at 5).

Plaintiff never informed Defendant Mauldin verbally or in writing that he was afraid of Inmate Sanchez, that he believed his safety was in jeopardy at Inmate Sanchez's hands, or that he needed protective custody because of a threat from Inmate Sanchez. Even if Plaintiff had told Defendant Mauldin about "rising tensions" between him and Inmate Sanchez, Defendant Mauldin would not have interpreted that as a threat of physical harm to Plaintiff. To the contrary, Plaintiff and Inmate Sanchez were "good workers who did not appear to have any problems with each other." (Doc. No. 66-3 at 5). If an inmate informed Mauldin that he felt his safety was in danger from another inmate, Defendant Mauldin "would immediately report the inmate's concerns to the supervisor." (Id.). However, since Plaintiff never told Defendant Mauldin he was afraid of Inmate Sanchez or any other inmate, Defendant Mauldin "never had any reason to make such a report regarding Plaintiff." (Id.).

Defendant Mauldin denies that he has "ever knowingly or willfully acted in any manner

intended to deprive Plaintiff of any right secured to him under the laws of the State of North Carolina or the Constitution of the United States." (Doc. No. 66-3 at 5).

**(D)** **Defendant Parsons' Affidavit** (Doc. No. 66-2)

Defendant Lawrence Parsons, Jr., was the as Acting Administrator of Lanesboro during November, 2011. (Doc. No. 66-2 at 2). As Administrator, Defendant Parsons' duties included supervising day-to-day operation of the prison. To the best of Defendant Parsons' recollection, Plaintiff was housed in Union Unit under Unit Manager Jeffrey Wall. (Doc. No. 66-2 at 2).

Defendant Parsons was usually notified of an assault in the prison on the day it happened unless he was not physically at the prison at the time the assault occurred. Even in that circumstance, he was informed whenever a serious assault or disturbance occurred at Lanesboro. (Doc. No. 66-2 at 3).

When an inmate was involved in an assault, a senior staff member like a Captain or Unit Manager would assign another staff member to investigate and prepare an incident report. As administrator, Defendant Parsons would review every incident report for every assault that occurred at LCI (Doc. No. 66-2 at 3). Defendant Parsons did not conduct any investigations of any type. His involvement in investigations entailed reviewing incident reports. Defendant Parsons had to approve all incident reports before sending them to the Regional Director. (Doc. No. 66-2 at 2). Nor did Parsons conduct any disciplinary proceedings. If a staff member charged an inmate with a disciplinary infraction, it was investigated by a ranking officer (Lieutenant or Captain), or by a Disciplinary Hearing Officer. (Doc. No. 66-2 at 2). Defendant Parsons did not hear disciplinary appeals. (Doc. No. 66-2 at 3).

To Defendant Parson's knowledge, both Plaintiff and Inmate Sanchez were housed in Union Unit, B-pod on November 12, 2011. (Doc. No. 66-2 at 3). Parsons is aware that Plaintiff

alleged that staff members allowed inmates from other pods to come into his residence pod to facilitate attacks on other inmates. Parsons has no knowledge of this happening and did not give permission for any staff member to allow this to happen. (Doc. No. 66-2 at 3).

Defendant Parsons is aware that Plaintiff alleged that Inmate Sanchez procured a knife from the kitchen where they both worked and used that knife to attack plaintiff on November 12, 2011. (Doc. No. 66-2 at 3). To Defendant Parsons' knowledge, no knife has ever gone missing from the kitchen at Lanesboro. Defendant Parsons did not know Inmate Sanchez to possess a knife, he did not give Inmate Sanchez access to a knife at any time, nor did he allow or tell any other person to give Inmate Sanchez a knife. (Doc. No. 66-2 at 4).

On November 12, 2011, Defendant Parsons was informed by staff that Plaintiff had been assaulted by Inmate Sanchez. To Defendant Parsons' knowledge, the November 12, 2011 incident was the first and only incident between Plaintiff and Inmate Sanchez. Although Plaintiff alleged that Inmate Sanchez attacked him twice on November 12, Defendant Parsons is aware only of the attack that led to Plaintiff's injury. To Defendant Parsons' knowledge, Plaintiff did not report the first attack that day, nor did he request protection from Inmate Sanchez after the first attack. (Doc. No. 66-2 at 4).

Plaintiff never informed Defendant Parsons, verbally or in writing, that he was afraid of Inmate Sanchez, that he believed his safety was in jeopardy at the hands of Inmate Sanchez, or that he needed protective custody because of a threat from Inmate Sanchez. If Plaintiff had used the term "rising tensions" or similar language about the relationship between himself and Inmate Sanchez, Parsons would not have interpreted that as a threat of physical harm to Plaintiff or a concern requiring protective custody. (Doc. No. 66-2 at 4).

Inmates at Lanesboro can request protective custody from any staff member if they feel

their safety is in danger from another inmate. An inmate "must articulate to the staff member that he (1) desires protective custody and (2) he feels there is a threat to his physical safety if protective custody is not granted." (Doc. No. 66-2 at 4). To Defendant Parsons' knowledge, Plaintiff never requested protective custody at Lanesboro.

All inmates entering the DOP receive an Inmate Handbook outlining the expectations for inmate behavior. If an inmate has an unresolved complaint about conditions of confinement, he can file a formal grievance after discussing the issue with staff. (Doc. No. 66-2 at 4-5). To Defendant Parsons' knowledge, Plaintiff never made a complaint to any staff member that his physical safety was in jeopardy. (Doc. No. 66-2 at 4-5). Even if Plaintiff made such an initial complaint that went unresolved, Plaintiff had the option to file a grievance to address the issue. Plaintiff never filed any grievance alleging he was denied protective custody or felt unsafe at Lanesboro. (Doc. No. 66-2 at 5).

Plaintiff filed a grievance on July 30, 2012, alleging inadequate investigation into the attack by Inmate Sanchez. This grievance was dismissed and indicated that "at no time was there a report of a real knife used on you to inflict injury to your body. The investigator indicated that had you reported the first incident between inmate Sanchez and yourself the second incident could have possibly been prevented." (Doc. No. 66-2 at 5).

Defendant Parsons denies that he ever knowingly or willfully acted in any manner intended to deprive Plaintiff of any right secured to him under the laws of the State of North Carolina or the Constitution and laws of the United States. (Doc. No. 66-2 at 5).

**(E)**      **Defendant Harrington's Deposition** (Doc. No. 70-4)

Defendant John Harrington started working at Lanesboro 2005 as a Food Service Officer, and that is the position he held in November 2011. (Doc. No. 70-4 at 6).

Whenever Harrington or another officer came upon an incident where two inmates may have something going on between them, it is Harrington's responsibility to report it to his supervisor, or then next higher person who is available and "let them take care of the problem." (Doc. No. 70-4 at 18). Whether he would go up the chain of command would depend on how serious the matter was with the other inmate. Harrington could take care of minor disagreements directly, "and then anything that I think that might become bigger or more serious, I would report it." (Doc. No. 70-4 at 35). If an inmate said another threatened him physically, he would "report it either my supervisor or the OIC" officer in charge on that shift. (Doc. No. 70-4 at 36). Once an altercation begins, officers are already calling it in on the radio. Master control picks it up and they announce the code on the intercom for the whole institution. (Doc. No. 70-4 at 42). This could happen four or five times a week, on average, usually about once a day. (Doc. No. 70-4 at 43). Harrington does not recall any physical altercations that happened in the kitchen when he worked there. (Doc. No. 70-4 at 18).

Plaintiff, who worked in the kitchen as a diet cook and worked in the supply room, was an average inmate who did not cause problems in the kitchen and had a great work ethic. (Doc. No. 70-4 at 19-20). Inmate Sanchez, who worked as a janitor, in the dish room, and on the serving line, seemed to get along with everyone and did not cause any problems inside the kitchen. Defendant Harrington did not recall ever learning from Plaintiff or Inmate Sanchez that there was any conflict or difficulty between the two. He does not recall Plaintiff ever coming to him to tell him he had concerns about Inmate Sanchez. (Doc. No. 70-4 at 21).

Defendant Harrington is aware of media accounts of violence at Lanesboro and talked to co-workers about it. (Doc. No. 70-4 at 22). With regards to Lanesboro's reputation for safety or violence, Defendant Harrington stated "… I'd say good compared to what we – what we do inside

the institution. What the media put out and what we do is two different things. What we control on the inside is a lot more than what the public put out and give us credit for." (Doc. No. 70-4 at 22).

Defendant Harrington was never interviewed by any law enforcement officials about any assaults at Lanesboro, he never complained about safety to anyone there, and nobody ever complained to him about safety of inmates there. (Doc. No. 70-4 at 23). He was never in a situation at Lanesboro where he did not feel safe. (Doc. No. 70-4 at 27).

Defendnat Harrington would hear what was going on and incidents do happen, but being down in the kitchen "we don't never get the full detail on exactly what's going on…." (Doc. No. 70-4 at 23). He heard things about violence, corruption, and contraband cell phones and weapons, and an incident with Wall being fired, but he has no direct knowledge about those incidents. (Doc. No. 70-4 at 26-28). Defendant Harrington had no experience or knowledge of contraband or weapons coming into Lanesboro. He was not aware of reports that there may be detention officers who are affiliated with gangs or working in conjunction with gangs. He had no experience or knowledge of any correctional officers being disciplined or accused of associating with gangs. Over the years several inmates have died; one was stabbed two or three years ago, there was a recent overdose, and there were a couple suicides. (Doc. No. 70-4 at 29-30).

There are procedures to prevent the intro of cell phones, drugs, and weapons into Lanesboro, including metal detectors and searches. (Doc. No. 70-4 at 31). If contraband such as cell phones, drugs, weapons may make it into Lanesboro, "[e]ither they put it in the food, went in – put it somewhere in their body, like, you know, carry it – put it somewhere on their body that can't be detected by the metal detector or search." (Doc. No. 70-4 at 31-32). "Anything is possible" regarding concealing contraband so that it can get through a metal detector. (Doc. No. 70-4 at 32).

With regards to the shake-down room outside the kitchen, two officers are supposed to work there but there have been times where only one officer has worked in that area. (Doc. No. 70-4 at 32).

Harrington has never worked in a unit and has never been disciplined regarding his employment. (Doc. No. 70-4 at 45-46).

**(F)** **Defendant Mauldin's Deposition** (Doc. No. 70-5)

Defendant Rodney Mauldin started working at Lanesboro in July 2006, and is now retired. (Doc. No. 70-5 at 6). He received standard correctional officer training for about four weeks that teaches rules and how to behave, and he also received food service training. (Doc. No. 70-5 at 7). "[W]e were trained and common sense really tells you to keep your utensils, especially knives, away from inmates, keep them under control. What we did, we had them locked up under lock and key and we had sign-out sheets." (Doc. No. 70-5 at 7). Outside the kitchen, there is a shakedown room with metal detectors that were normally operated by custody officers. (Doc. No. 70-5 at 8). Part of the reason for the shakedowns was that a "popular pastime" was to try to sneak food out of the kitchen. (Doc. No. 70-5 at 25).Defendant Mauldin was not aware of any incidents or assaults that occurred in the prison where it was determined that the item used as a weapon came from the kitchen. (Doc. No. 70-5 at 10).

With regards to policies or training about reporting potential threats or security concerns raised by inmates, he stated "[w]e were always told that if – if we were aware of some possible situation, some possible problem to bring it up to supervisors." (Doc. No. 70-5 at 11). Defendant Mauldin's supervisor was Food Service Manager Constance Clark; she would notify the officer in charge or assistant superintendent if there was a problem.

Defendant Mauldin remembers Plaintiff, who was a diet cook and may have worked in the stockroom, who did a good job. (Doc. No. 70-5 at 16-17). Inmate Sanchez worked in the dish

room. Defendant Mauldin did not recall having trouble with Inmate Sanchez and does not know if he was STG designated. (Doc. No. 70-5 at 17).

Defendant Mauldin does not recall Plaintiff ever talking to him about concerns regarding safety or Inmate Sanchez and "[i]f he ever did, I certainly don't recall it … [a]nd I think I would remember that." (Doc. No. 70-5 at 19). He never had any disciplinary trouble with Plaintiff, however, he did sometimes help Plaintiff with anger management issues. (Doc. No. 70-5 at 24). He did not recall Plaintiff telling him anything about Inmate Sanchez taking food. He had no specific recollection about that general problem happening with Plaintiff or Sanchez.

Defendant Mauldin did not recall Plaintiff ever speaking to him about issues with Inmate Sanchez (Doc. No. 70-5 at 61-62); "Had I been made aware or noticed any kind of friction between inmates, I would've … at the very least, notified staff on the housing unit to watch out for potential problems." (Doc. No. 70-5 at 62). There is a partition separating food prep room and dish room, so Plaintiff and Sanchez were not working right next to each other. He does not remember any circumstance when Plaintiff and Inmate Sanchez were working together at the same location. (Doc. No. 70-5 at 63). Defendant Mauldin never notified anybody of any risk to Plaintiff by Inmate Sanchez because he "was never aware of any risk…." (Doc. No. 70-5 at 31). Had he known, he "certainly would have notified the people in the housing unit to keep an eye on things" as part of his training and duty as a correctional officer. (Doc. No. 70-5 at 31).

Defendant Mauldin was not interviewed after the incident between Plaintiff and Inmate Sanchez happened because it did not happen in the kitchen. He probably became aware the next day because Plaintiff would not have shown up to work. Later, he was told that the two of them had a fight and a knife or kind of shank was involved. (Doc. No. 70-5 at 20).

Defendant Mauldin did not see a lot of incidents of violence at Lanesboro because he only

worked in the kitchen. He heard about a lot of incidents and noted that lately they seemed to have gotten more gang members, and a lot of the violence seemed to be gang-related. (Doc. No. 70-5 at 20). He knew of incidents and was aware investigations were going on, but he was never interviewed. (Doc. No. 70-5 at 21). With regards to Lanesboro's reputation regarding violence or assaults, he stated that Lanesboro's reputation "has gotten, well, not so good … [because] we got a lot more gang members in there, and putting all rotten eggs in one basket is not a good idea. But as far as other prisons of – of this type, I – I don't know. I – I think you're going to have trouble at all of them." (Doc. No. 70-5 at 21-22).

He heard about an investigation into corruption by Wall and other officers who were gang members or participated with gang members but does not know anything about it. (Doc. No. 70-5 at 22). During the time he worked at Lanesboro, never feared for his own safety. He was there when Administrator Mitchell was attacked but he never heard any real details. He also remembers when Inmate Wesley Turner was killed by another inmate in 2012. (Doc. No. 70-5 at 26). Assaults occurred throughout the prison, but Union might have become a little worse than the other parts but he was unsure of the timing. (Doc. No. 70-5 at 26). His personal opinion about the level of risk to detention officers at Lanesboro from his experience is that "there's definitely a risk, but I have – I have no knowledge of – of – of that beyond knowing that there's always a risk, you watch your back." (Doc. No. 70-5 at 46). He did not ever feel more or less safe at Lanesboro over the course of time, stating "it's a dangerous place, and you watch – you watch yourself." (Doc. No. 70-5 at 46).

With regards to whether people were fully doing their jobs during shakedown, he stated "Well, let's see. That's a possibility that they weren't. I – I don't know that I had reason to suspect that, but that's definitely a possibility." (Doc. No. 70-5 at 30). Inmates would sometimes make it

out of the kitchen with food by using "clever hiding places." (Doc. No. 70-5 at 30). When inmates were in shakedown, Mauldin would normally go to the kitchen; he would not go through the shakedown area. (Doc. No. 70-5 at 36). Inmates are in the custody of officers in the shakedown room when they leave the kitchen. (Doc. No. 70-5 at 37). It is "possible" that detention officers did not necessarily make inmates go through the metal detector each time they left the kitchen. (Doc. No. 70-5 at 47). Officers clocked in and out and went through metal detector when came and went. (Doc. No. 70-5 at 38). He did not have any reason to believe that the people doing the checking might not be thorough or check everybody each time, stating, "[n]o. They were – every time I came through, they were thorough." (Doc. No. 70-5 at 38).

**(G)** **Defendant Parsons' Deposition** (Doc. No. 70-3)

Defendant Lawrence Parsons worked as a captain at Lanesboro in 2003, then left for another institution in 2006. He returned to Lanesboro as Assistant Superintended under Richard Neely in 2010. (Doc. No. 70-3 at 194). He began serving as Acting Administrator in April 2011, when Neely was arrested,[5] he eventually became Lanesboro's Administrator, and was transferred to another institution in 2012. (Doc. No. 70-3 at 9). Parsons was aware of that when he took over as Administrator that Lanesboro may have had more than its share of problems. (Doc. No. 70-3 at 198).

It was Defendant Parsons' duty as Acting Administrator to keep staff and inmates safe, and to make sure staff were adequately trained on how to keep inmates safe and how to investigate incidents between inmates and officers. To make sure contraband did not come into Lanesboro, Defendant Parsons would talk to staff in the break room, he had a gate log procedure in place for

---

[5] Parsons admitted that he knew Neely's arrest had to do with Neely's attempt to have destroyed a videotape of an inmate assault. (Doc. No. 70-3 at 11-12).

an "empty" entrance and exit policy, and staff would have to go through metal detectors and their belongings went through an x-ray machine, and hand-held metal detectors were available. (Doc. No. 70-3 at 143-44). If people followed those procedures, it could have kept weapons, drugs and cell phones out of Lanesboro. (Doc. No. 70-3 at 144). Contraband could still get inside Lanesboro if metal detectors were used because there are ways to defeat metal detectors. (Doc. No. 70-3 at 145). The metal detectors "should have been used all the time" and, to Parsons' knowledge, they were used all the time. (Doc. No. 70-3 at 145). To ensure the metal detectors were used at all times, Parsons would check video and would talk to captains and lieutenants, who all knew the entry and exit policy required check by hand-held metal detector. (Doc. No. 70-3 at 145). To make sure the metal detector policy was being followed in the kitchens, there was a metal detector policy and a kitchen supervisor was present. (Doc. No. 70-3 at 165-66). He had no idea whether inmates can get around metal detectors and often walked around them because he was not there. (Doc. No. 70-3 at 166-67). It cannot be helped it if a weapon is concealed in a way that the metal detector does not pick it up, or if the machine fails to beep. (Doc. No. 70-3 at 148-49).

A number of people were stabbed with weapons in the Union Unit while Defendant Parsons was Administrator. (Doc. No. 70-3 at 77). In the whole institution, there could have been 50 or 100 stabbings between 2008 and 2012, one of them being fatal. (Doc. No. 70-3 at 79). Defendant Parsons knew prior to Plaintiff being assaulted that there were other people who were assaulted with knives at Union Unit, where Jeffrey Wall was the Unit Manager. (Doc. No. 70-3 at 142). Parsons has "no idea" the number of assaults on Union Unit before the assault on Plaintiff and does not know the average monthly number of assaults. (Doc. No. 70-3 at 149-50). Defendant Parsons does not know how the number of knife assaults at Lanesboro compared to other close facilities. (Doc. No. 70-3 at 163). He does not recall getting reports or letters from Raleigh saying

there were more assaults at Lanesboro than other facilities. There had been a number of knife attacks in Union Unit but Parsons "[is] not going to say it wasn't safe." (Doc. No. 70-3 at 162). Although acknowledging that several inmates were stabbed and Wesley Turner was killed on the unit, Parsons stated "[i]t was supposed to be operated in a safe manner." (Doc. No. 70-3 at 162). An SBI and FBI investigation revealed weapons concealed in the ceiling of Wall's, however, that happened after Defendant Parsons had left Lanesboro between August and December 2013. (Doc. No. 70-3 at 81-82).

As soon as an incident happened at Lanesboro, a code would be called from within on the PA system. (Doc. No. 70-3 at 32-33). Defendant Parsons is usually notified of incidents by email and, if the situation is life-threatening, by phone call. (Doc. No. 70-3 at 102-03). After an incident was under control, the involved inmates would be taken for medical attention if needed. (Doc. No. 70-3 at 33). Everyone would get health screening and then administrative segregation – lockup for 23 hours a day, exercise, and a shower, while the incident was investigated. (Doc. No. 70-3 at 34). Their practice to put everyone, including the victim, in segregation until an incident is investigated to make sure staff understood all the circumstances surrounding the incident. (Doc. No. 70-3 at 34-35).

When assault with a weapon occurs, Defendant Parsons assigns the matter to an officer or staff to investigate. (Doc. No. 70-3 at 26). The weapon is confiscated and put it in contraband locker, then the matter is brought before DHO for finding of guilt. To Defendant Parson's knowledge, where there were assaults with weapons while he was at Lanesboro, there was not a situation where a weapon was not found. (Doc. No. 70-3 at 28). If there was an incident that happened or officers intervened, if there is a weapon, it's "our duty to get that weapon. Now, if another – if they threw it or hid it or did something to distract us, I mean, to hide the thing or give

it to somebody, that's beyond our control. But if they had the weapon and we saw it, we took possession of it." (Doc. No. 70-3 at 28). A weapon could be beyond his control because inmates can hide them just as they hide other contraband. (Doc. No. 70-3 at 28).

Steps for investigating assault with a knife would be to gather statements from inmates and staff; read all the statements and summarize them in an incident report; summarize what happened, then turn it into the unit manager or captain, depending on who it was under; unit manager would review it and send it to the assistant superintended of custody and operation; unit would decide if disciplinary charges should be issued. (Doc. No. 70-3 at 39).

Defendant Parsons agrees there was evidence of a weapon used in Plaintiff's assault and that no weapon was recovered. (Doc. No. 70-3 at 130). There should have been an attempt to go find the weapon. (Doc. No. 70-3 at 131). One staff member noted that they looked for a weapon but none was found. Defendant Parsons did not investigate where the weapon went because he was not the investigating officer. (Doc. No. 70-3 at 135-37). Parsons does not know if anyone searched the whole pod to find the lost weapon, stating "[a]nything's possible." (Doc. No. 70-3 at 137). On December 4, Defendant Parsons reviewed the case and said all the policies were followed even though no weapon was found. (Doc. No. 70-3 at 138-39). Documents do not show that local law enforcement was notified or that criminal charges were brought against Inmate Sanchez even though it appears that there was an assault with a deadly weapon inflicting serious injury. (Doc. No. 70-3 at 139-40).

If one inmate assaults another, it is an A-charge, which is serious and goes before a DHO. (Doc. No. 70-3 at 23). Mutual fighting is a less serious C-charge which can go right to a captain or unit manager. (Doc. No. 70-3 at 24). Someone who is defending himself might get a C4-charge instead of an A-charge (Doc. No. 70-3 at 41-42). If there were disciplinary charges while

Defendant Parsons was administrator, he was given a copy of the incident report and disciplinary charge. (Doc. No. 70-3 at 31). After the DHO hears a case, if the inmate wants to appeal the case goes to Raleigh. (Doc. No. 70-3 at 43). Raleigh would get the package that the DHO looked at without any new evidence. (Doc. No. 70-3 at 44).

Petitioner was initially charged with an A10-charge for assault, even though there was no evidence that Plaintiff had a weapon and the evidence appeared to show that Inmate Sanchez stabbed Plaintiff as he came down stairs and threw a chair at him. (Doc. No. 70-3 at 120). Plaintiff was found guilty but appealed to Raleigh and the charge was dismissed. (Doc. No. 70-3 at 122). A charge of C4 is for mutual physical confrontation was approved by Unit Manager Wall's assistant. (Doc. No. 70-3 at 122). However, Unit Manager Wall changed it to a more serious charge and it was an assault charge when it got to Defendant Parsons. (Doc. No. 70-3 at 126). Defendant Parsons does not know why Unit Manager Wall increased the charge. (Doc. No. 70-3 at 126). Defendant Parsons does not review the disciplinary reports, he reviews the incident reports. (Doc. No. 70-3 at 129).

Lanesboro is divided into housing units and pods pursuant to the unit management concept. (Doc. No. 70-3 at 36-37). There are rules about inmates moving pod-to-pod. (Doc. No. 70-3 at 44). People from different units need to be kept separate from each other. (Doc. No. 70-3 at 46). "There … were gangs all over" in "all pods. That's just how it was." (Doc. No. 70-3 at 46). STG designation is a "security threat group." (Doc. No. 70-3 at 54-55). STG members still live in the pods, go to class, etc. As long as they are following the rules they are not on 23-hour a day lockup. (Doc. No. 70-3 at 56). STG members have the same privileges as everyone else and could work in the kitchen. (Doc. No. 70-3 at 56-57).

There was a lot of press about Unit Manager Wall who was being questioned and

investigated while Defendant Parsons was still at Lanesboro surrounding the gang-related stabbing death of Inmate Wesley Turner. (Doc. No. 70-3 at 65). Defendant Parsons' assessment of Wall as a unit manager was that "[h]e did his job, filed the reports, any report that needed to be done." (Doc. No. 70-3 at 65). To the best of Defendant Parsons' knowledge, Unit Manager Wall did a good job. (Doc. No. 70-3 at 65-66).

Defendant Parsons admits that at least two staff members approached him with concerns about the way Union Unit was being operated. (Doc. No. 70-3 at 68, 161). If a specific concern was conveyed to Defendant Parsons, he would talk to both of the involved staff members or pass it along to Raleigh. (Doc. No. 70-3 at 68). If a staff member had told Defendant Parsons repeatedly that Unit Manager Wall was affiliated with gangs and was jeopardizing the security of his inmates by violating procedures in Union Unit, he would have investigated those allegations. (Doc. No. 70-3 at 156, 161-62). Defendant Parsons could not recall if a staff member had told him these things or not. (Doc. No. 70-3 at 156). There was never a time when he was told about a policy being violated by Unit Manager Wall or anyone else in the prison that he did not take action. (Doc. No. 70-3 at 215).

## II.    LEGAL STANDARDS

### (1)    Summary Judgment

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fec. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. Id.

The movant has the "initial responsibility of informing the district court of the basis for its

motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. Id. at 324. The nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; accord Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

**(2)     Due Process**

The Fourteenth Amendment's Due Process Clause provides that no person shall be deprived of "life, liberty, or property, without due process of law." U.S. Const. Amend XIV. Lawful imprisonment necessarily makes unavailable many rights and privileges of the ordinary citizen. Wolff v. McDonnell, 418 U.S. 539, 555 (1974). Although a prisoner's rights may be diminished by the needs and exigencies of the institutional environment, "a prisoner is not wholly stripped of constitutional protections while he is imprisoned for crime." Id. They retain, *inter alia*,

the protections of the Due Process Clause in that they may not be deprived of life, liberty, or property without due process of law. Haines v. Kerner, 404 U.S. 519 (1972). The fact that prisoners retain due process rights "in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed." Wolff, 418 U.S. at 555. To state a procedural due process violation, a plaintiff must: (1) identify a protected liberty or property interest and (2) demonstrate deprivation of that interest without due process of law. Prieto v. Clarke, 780 F.3d 245, 248 (4th Cir. 2015). If no state statute, regulation, or policy creates such a liberty interest, a prisoner cannot "invoke the procedural protections of the Due Process Clause." Meachum v. Fano, 427 U.S. 215, 224 (1976). The Due Process Clause is not implicated by the lack of due care of an official causing unintended injury to life, liberty or property. Daniels v. Williams, 474 U.S. 327 (1986).

**(A)      Privacy & Bodily Integrity**

The Eighth Amendment "'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" Williams v. Benjamin, 77 F.3d 756, 768 (4th Cir. 1996) (emphasis in original) (quoting Whitley v. Albers, 475 U.S. 312, 327 (1986)). "[W]here a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." Davidson v. Cannon, 474 U.S. 344, 347 (1986). The Due Process Clause is not implicated where a claim is based on prison officials' lack of due care in protecting an inmate from an attack by another inmate that led to serious injury. Id. Such a claim is "quite different from one involving injuries caused by an unjustified attack by prison guards themselves… or by another prisoner where officials simply stood by and permitted the attack to proceed…." Id.

44

**(B)      Discipline & Classification**

The punishment of incarcerated prisoners effectuates prison management and rehabilitative goals. Sandin v. Connor, 515 U.S. 472, 485 (1995). There must be "mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application." Id. "Prison disciplinary proceedings are not part of a criminal prosecution, and the fully panoply of rights due to a defendant in such proceedings does not apply. Wolff, 418 U.S. at 555. To satisfy due process with regards to a prisoner's disciplinary proceedings, a prison must provide advance written notice of the claimed violation and a written statement by the factfinders as to the evidence relied on and the reasons the disciplinary action was taken. Id. at 563. The core component of due process in the prison discipline context is the right to a hearing. Id. at 566.

Prison regulations providing for procedures in connection with punishment will not give rise to a protected liberty interest unless the punishment in question "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484 (finding that defendant's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a state might conceivably create a liberty interest). Further, "it is clear … that for safety or security reasons, a jail may take immediate preventative action to segregate [an inmate] after a fight or disruption." Dilworth v. Adams, 841 F.3d 246, 255 (4th Cir. 2016). Absent some evidence or claim that his disciplinary conviction was improperly obtained, a prisoner's assertions that the initial charge was false cannot state a claim. Richardson v. Ray, 492 Fed. Appx. 395, 396 (4th Cir. 2012).

**(3)      Failure to Protect**

The Eighth Amendment prohibits punishments that "involve the unnecessary and wanton infliction of pain." Estelle v. Gamble, 429 U.S. 97, 103 (1976) (quoting Gregg v. Georgia, 428

U.S. 153, 173 (1976)). The Eighth Amendment imposes a duty on prison officials to "protect prisoners from violence at the hands of other prisoners." Farmer v. Brennan, 511 U.S. 825, 833 (1994) (internal quotations omitted). To obtain relief under § 1983 on a claim of failure to protect, an inmate must show: (1) "serious or significant physical or emotional injury" resulting from that failure; and (2) the prison officials had a "sufficiently culpable state of mind," which in this context is deliberate indifference. Farmer, 511 U.S. at 834. A prison official is "deliberately indifferent to a substantial risk of harm to a [prisoner] when that [official] 'knows and disregards' the risk." Parrish ex rel. Lee v. Cleveland, 372 F.3d 294, 302 (4th Cir. 2004) (quoting Farmer, 511 U.S. at 837). "It is not enough to prove that the official should have known of the risk; instead, 'the official must both be aware of the facts from which the inference could be drawn that a substantial risk of harm exists, and he should draw the inference.'" Kartman v. Markle, 582 Fed. Appx. 151, 153 (2014) (quoting Farmer, 511 U.S. at 837). A showing of negligence does not rise to the level of deliberate indifference. Davidson, 474 U.S. at 347-48.

A prison official's subjective actual knowledge can be proven through circumstantial evidence, for example, that the "substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it." Farmer, 511 U.S. at 842. Direct evidence of actual knowledge is not required. Id. A prison official cannot escape liability for deliberate indifference by showing that, "while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843. The question is whether prison officials, acting with deliberate indifference, exposed a prisoner to a sufficiently substantial "risk of serious

damage to his future health… and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." <u>Farmer</u>, 511 U.S. at 843. However, because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment, it remains open to the officials to prove that they were unaware of an obvious risk to inmate health or safety. For example, they may show "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent." <u>Farmer</u>, 511 U.S. at 844. In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, "even if the harm was not averted" because a prison official's duty is to ensure "reasonable safety." <u>Id.</u> (quoting <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993)). This standard "incorporates due regard for prison officials' 'unenviable task of keeping dangerous men in safe custody under humane conditions.'" <u>Id.</u> (quoting <u>Spain v. Procunier</u>, 600 F.2d 189, 193 (9th Cir. 1979) (Kennedy, J.). Absent successful rebuttal, prison officials may be held liable for obvious risks they must have known. <u>Makdessi v. Fields</u>, 789 F.3d 126, 133 (4th Cir. 2015) (citing <u>Farmer</u>, 511 U.S. at 842).

The Fourth Circuit addresses a failure to intervene claim as a theory of "bystander liability" wherein there is "an omission to act...coupled with a duty to act." <u>Randall v. Prince George's Cnty.</u>, 302 F.3d 188, 202 (4th Cir. 2002). A "bystander officer" could be liable for his or her nonfeasance if he or she: "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." <u>Id.</u> at 204. However, if no excessive force is applied by the fellow officer, the officer witnessing the conduct "cannot be

held liable under bystander liability for a failure to intervene." Howie v. Prince George's Cnty., 2009 WL 2426018 at *6 (D. Md. Aug. 5, 2009).

**(4)**    **Supervisory Liability**

A state official can be in a § 1983 suit in three ways: in his personal capacity, his official capacity, or in a more limited way, his supervisory capacity. King v. Rubenstein, 825 F.3d 206, 223–24 (4th Cir. 2016). For personal liability, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985). In an official-capacity suit, however, "[m]ore is required:" the suit is "treated as a suit against the entity," which must then be a "'moving force' behind the deprivation," id. (quoting Polk County v. Dodson, 454 U.S. 312, 326 (1981)); thus, the entity's "'policy or custom' must have played a part in the violation of federal law," id. (quoting Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978)). Meanwhile, a supervisor can be liable where (1) he knew that his subordinate "was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury;" (2) his response showed "deliberate indifference to or tacit authorization of the alleged offensive practices;" and (3) that there was an "affirmative causal link" between his inaction and the constitutional injury." Shaw v. Stroud, 13 F.3d 791, 799 (4th Cir. 1994) (internal quotation marks omitted).

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of Another State, or by Citizens of any Foreign State." U.S. Const. Amend. 11. Thus, § 1983 suits against a state, its agencies, and its officials sued in their official capacities for damages are barred absent a waiver by the State or a valid congressional override. Graham, 473 U.S. at 169.  "In an official capacity action, the plaintiff seeks damages not from the

individual officer, but from the entity for which the officer is an agent." Pusey v. City of Youngstown, 11 F.3d 652, 657 (6th Cir.1993). "[A]n official capacity suit is, in all respects other than name, to be treated as a suit against the entity." Graham, 473 U.S. at 166. Therefore, a lawsuit against an officer in his official capacity is, in substance, a claim against the governmental entity and should be subject to the same analysis. See Almone v. City of Long Beach, 478 F.3d 100, 106 (2d Cir. 2007); see Hutto v. S.C. Retirement Sys., 773 F.3d 536, 549 (4th Cir. 2014) (state officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the state). Whether an officer is deemed a "state official" depends at least in part on state law. See Mt. Healthy City Sch. Bd. Of Ed. v. Doyle, 429 U.S. 274, 280 (1977).

However, a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." Will v. Michigan Dep't of State Police, 491 U.S. 58, 93 (1989) (quoting Graham, 473 U.S. at 167, n.14). A prisoner's transfer moots a § 1983 request for declaratory and injunctive relief when the conditions of which the prisoner claims are unlikely to recur. See Williams v. Griffin, 952 F.2d 820 (4th Cir. 1991); Taylor v. Rogers, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986).

**(5)** **Qualified Immunity**

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). Qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v.

Callahan, 555 U.S. 223, 231 (2009). The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Groh v. Ramirez, 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting) (quoting Butz v. Economou, 438 U.S. 478, 507 (1978), for the proposition that qualified immunity covers "mere mistakes in judgment, whether the mistake is one of fact or one of law"). The doctrine of qualified immunity gives officials "breathing room to make reasonable but mistaken judgments about open legal questions." Ziglar v. Abbasi, 137 S.Ct. 1843, 1866 (2017) (quoting Ashcroft v. al–Kidd, 563 U.S. 731, 743 (2011)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability ... it is effectively lost if a case is erroneously permitted to go to trial." Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted). The "driving force" behind creation of the qualified immunity doctrine was a desire to ensure that "'insubstantial claims' against government officials [will] be resolved prior to discovery." Anderson v. Creighton, 483 U.S. 635, 640, n. 2 (1987). Accordingly, the Supreme Court has "repeatedly have stressed the importance of resolving immunity questions at the earliest possible stage in litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991).

In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a two-step sequence for resolving government officials' qualified immunity claims by determining whether: (1) the facts that a plaintiff has alleged or shown make out a violation of a constitutional right; and (2) the right at issue was "clearly established" at the time of defendant's alleged misconduct. While the sequence of the steps set forth in Saucier is "often appropriate," it is not mandatory. Pearson, 555 U.S. at 236. Judges are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances

in the particular case at hand. Id.

To overcome the qualified immunity defense at the summary judgment stage, the plaintiff must have shown facts that make out a violation of a constitutional right, and the right at issue must have been "clearly established" at the time of the defendant's alleged misconduct. Thompson v. Commonweath of Va., 878 F.3d 89, 97 (4th Cir. 2017) (citing Pearson, 555 U.S. at 232). The analysis takes place against the backdrop of two dueling interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson, 555 U.S. at 231.

To determine if the right in question was clearly established, the court first looks to cases from the Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose. Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004). In the absence of "directly on-point binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority." Booker v. South Carolina Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017); Owens, 372 F.3d at 279 ("the absence of controlling authority holding identical conduct unlawful does not guarantee qualified immunity."). Ordinarily, the unlawfulness of government conduct must be apparent in light of pre-existing law. White v. Pauly, 137 S.Ct. 548, 442 (2017). However, a "general constitutional rule … may apply with obvious clarity ... even though the very action in question has not previously been held unlawful. Hope v. Pelzer, 536 U.S. 730, 741 (2002) (citing United States v. Lanier, 520 U.S. 259, 271 (1997)). Therefore, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Id. at 741.

## III.    DISCUSSION

**(1)    Due Process**

### (A)        Privacy & Bodily Integrity

Plaintiff contends that Defendants violated his due process right to be free from violations of his privacy and bodily integrity for failing to prevent Inmate Sanchez's attack.

Plaintiff's claim is more appropriately asserted under the Eighth Amendment as a claim of deliberate indifference, rather than Fourteenth Amendment due process, because the Eighth Amendment "'serves as the primary source of substantive protection to convicted prisoners,' and the Due Process Clause affords a prisoner no greater *substantive* protection 'than does the Cruel and Unusual Punishments Clause.'" Benjamin, 77 F.3d at 768. As Plaintiff is alleging lack of due care by prison officials that led to Plaintiff's injury at the hands of another inmate, the appropriate constitutional provision is the Eighth Amendment's deliberate indifference analysis. See Davidson, 474 U.S. at 347.

Therefore, Defendants' Motion for Summary Judgment is granted with regards to Plaintiff's due process privacy and bodily integrity claim.

### (B)        Discipline & Classification

Plaintiff alleges that Defendants improperly punished him for the incident by placing him in administrative segregation when he returned from the hospital following the incident, and by improperly charging him with assault even though he was only defending himself from Inmate Sanchez's violent attack.

As a preliminary matter, there is no dispute of material fact that Defendants Harrington and Mauldin are kitchen workers who did not witness the incident, and did not have any part in investigating the incident or in instituting disciplinary proceedings against him. Therefore, to the

extent that Plaintiff intended to assert a claim against Defendants Harrington and Mauldin with regards to his classification and disciplinary proceedings, their motion for summary judgment is granted.

Defendant Parsons' motion for summary judgment is also granted with regards to discipline and classification. First, Plaintiff's suggestion that he was improperly punished in administrative segregation upon returning from the hospital fails to state a constitutional violation. Defendant Parsons explained that, pursuant to prison policy, all participants in a violent incident are temporarily placed in administrative segregation pending a staff investigation. See (Doc. No. 66-2 at 9) (Lanesboro Inmate Booklet defining administrative segregation as "[a]n assignment status that temporarily removes an inmate from general population and places them in a single cell on a short-term basis to provide control or protection of the inmate pending final classification or disciplinary action."). Plaintiff fails to rebut Defendant Parsons' assertion that his placement in administrative segregation was pursuant to prison policy rather than a punishment. Nor does he explain why his short stay in administrative segregation was a substantial and atypical hardship. Therefore, Plaintiff's short stint in administrative segregation was not punishment and did not violate due process. See Dilworth, 841 F.3d at 255 (for safety or security reasons, a jail may take immediate preventative action to segregate [an inmate] after a fight or disruption).

Second, Plaintiff's argument that he was over-charged in his disciplinary proceedings for assault fails to state a constitutional violation. Defendant Parsons explained that Plaintiff was initially charged with mutual combat, but that Unit Manger Wall later upgraded the charge to assault. Defendant Parsons conceded that an assault charge would not be appropriate if a prisoner was the victim of a violent assault and was merely defending himself. However, Defendant Parsons did not personally investigate the incident or have any part in upgrading the disciplinary charge to

53

assault. The decision to charge him with an assault was Unit Manager Wall's. The matter then went before a disciplinary hearing officer at Lanesboro who found him guilty, but the disciplinary charge was dismissed on appeal to the DHO officer in Raleigh. Plaintiff fails to allege that he was deprived of notice, a hearing, or written findings with regards to the disciplinary charge. Nor does he allege that the over-charging was due to any of Defendant Parsons' actions. Moreover, the assault charge was eventually overturned and he has failed to explain how it imposed substantial and atypical hardship on him.

Because Plaintiff has failed to explain how any of the Defendants violated his constitutional rights with regards to his classification and discipline connected with the incident, the Defendants' Motion for Summary Judgment is granted.

**(3)**     <u>**Failure to Protect**</u>

       **(A)**     <u>**Defendants Mauldin and Harrington**</u>

Plaintiff alleges in the Amended Complaint that he notified Defendants Mauldin and Harrington prior to November 12, 2011, about "rising tensions" between himself and Inmate Sanchez, and that Sanchez was stealing from the kitchen cooler, and took no action to remove Inmate Sanchez from the kitchen or prevent his access to knife-like objects. (Doc. No. 48 at 8).

Plaintiff states in his affidavit that he was working in the kitchen with Sanchez, a known gang member, on November 12, 2011. Sanchez would often neglect his duties in the kitchen and only fix food for himself and his friends. "Prior to November 12, 2011," Plaintiff told Defendants Mauldin and Harrington of Sanchez's actions. Plaintiff "advised Defendants Mauldin and Harrington of the rising tensions between Inmate Sanchez and [Plaintiff]. [He] asked Defendants Mauldin and Harrington to address the situation." (Doc. No. 66-4 at 2).

Defendants Mauldin and Harrington seek summary judgment because they were not aware

of a substantial risk of harm to Plaintiff by Sanchez or anyone else. Defendants Mauldin and Harrington state in their affidavits and depositions that they both worked in the kitchen, not in the housing unit where the attack occurred. Plaintiff and Inmate Sanchez were both good workers, they did not work in the same area of the kitchen, and Neither Defendant ever observed any problems between the two. Both of these Defendants deny recalling any conversation with Plaintiff reporting that he and Inmate Sanchez were having a conflict, or that he feared for his safety. (Doc. No. 66-1 at 5); (Doc. No. 66-3 at 5). Had Plaintiff expressed a fear for his safety to Mauldin or Harrington, they would have reported it to the appropriate authority. (Doc. No. 70-4 at 21); (Doc. No. 70-5 at 31). Even if Plaintiff has reported "rising tension" between himself and Inmate Sanchez, neither of these Defendants would have interpreted this as a serious safety concern requiring intervention. Moreover, no utensil or knife was missing from the kitchen at the time of Sanchez's attack on Plaintiff. As food service officers, Mauldin and Harrington were not responsible for conducting searches or operating metal detectors in the shake-down room outside of the kitchen, which were manned by correctional officers. Both Mauldin and Harrington were generally aware of the dangers present at Lanesboro as a high-security close custody prison.

Plaintiff has failed to create a genuine issue of material fact with regards to Defendants Mauldin and Harrington's alleged failure to protect him from Inmate Sanchez's attack on November 12, 2011. Accepting true Plaintiff's assertion that he told them that Inmate Sanchez was stealing food from the kitchen and that there were "rising tensions" between himself and Sanchez, this was insufficient to show that these Defendants knew of, and disregarded, a substantial risk of harm to Plaintiff. See, e.g., Bacchus v. Scarborough, 466 Fed. Appx. 269 (4th Cir. 2012) (affirming summary judgment for defendants on inmate's Eighth Amendment claim that they failed to protect him from a violent attack by a prison lieutenant where inmate's complaints to prison officials

regarding his verbal conflicts with the lieutenant "failed to offer a credible indication that [the lieutenant] posed a physical threat to [the inmate]."). Plaintiff has failed to demonstrate that these food service officers had a reason to believe that Inmate Sanchez posed a substantial risk of harm to Plaintiff, even in the context of a high-security prison housing dangerous inmates including gang members. See generally Porterfield v. Burton, 2009 WL 62209 (D.S.C. Jan. 8, 2009) (the fact that an inmate is classified as potentially dangerous is insufficient to establish a deliberate indifference claim); Blankenship v. Virginia, 432 F.Supp.2d 607 (E.D. Va. 2006) (noting that, "[a]ny time an individual is incarcerated, there is some risk that he may be a victim of violence at the hands of his fellow inmates…") (quoting Westmoreland v. Brown, 883 F.Supp. 67, 74 (E.D. Va. 1995)). Nor does Plaintiff allege that Defendants Mauldin and Harrington were physically present when the attack occurred, were able to intervene, and failed to do so. Both Defendants unequivocally stated that they only interacted with Plaintiff and Inmate Sanchez in the kitchen, never observed a problem between the two, and were not present in the housing unit when the incident occurred.

Therefore, Defendants Mauldin and Harrington will be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim for failure to protect him from Inmate Sanchez and for failure to intervene and stop the attack.

### (B)     Defendant Parsons

Plaintiff alleges that Defendant Parsons failed to protect Plaintiff from a pervasive, longstanding and well-documented risk of harm from assault by other inmates with contraband weapons that was unusually high at Lanesboro C.I., and particularly within Unit Manager Wall's Union Unit.

Parsons denies in his affidavit and deposition that he had specific knowledge about a

security threat that Inmate Sanchez posed to Plaintiff. However, he admits that he knew of the history of violent attacks at Lanesboro, and continuing violent assaults of which he was notified via PA announcements, emails, phone calls, and incident reports. However, he denied knowing the number of violent attacks, what proportion of them occurred, on Union Unit, and how Lanesboro's statistics compared to other maximum security prisons in North Carolina. He knew that there were security problems preceding his tenure as administrator, which resulted in Administrator Neely's termination and prosecution, and multiple staff firings. He was aware of gang activity at Lanesboro and also knew that contraband, including weapons, was prevalent. Defendant Parsons explained that, although there are many security measures in place that should eliminate contraband, including weapons, from entering Lanesboro, but that these items nevertheless made their way inside the institution via staff and, possibly, the mail. Defendant Parsons was also able to request PERT team assistance, which he employed on at least one occasion after Plaintiff's attack occurred.

Plaintiff has demonstrated the genuine dispute of a material fact with regards to Defendant Parsons' deliberate indifference to a threat to Plaintiff's safety. He has shown that a substantial risk of serious harm was longstanding, pervasive, and well-documented before the attack on him occurred. As Acting Administrator and Administrator at Lanesboro, Defendant Parsons knew via PA announcements, emails, phone calls, and incident reports, that inmate-on-inmate attacks with contraband weapons frequently occurred in the prison and were especially pervasive on the Union housing unit where Plaintiff was housed. Defendant Parsons had access to tools for reducing the danger in the housing units and there is a genuine disputed with regards to whether he took reasonable actions to reduce the threat to inmates' safety. The evidence suggests that Defendant Parsons did not know of a specific risk to Plaintiff that was posed by Inmate Sanchez, however, a

prison official may not avoid liability simply because he was unaware that Plaintiff was "especially likely to be assaulted by the specific prisoner who eventually committed the assault." Farmer, 511 U.S. at 843. There is also a dispute about whether Defendant Parsons sufficiently ensured that his staff were properly trained and that they adhered to security and safety policies. Material issues of fact preclude summary judgment for Defendant Parsons under these circumstances.

Because Plaintiff has demonstrated the existence of disputed fact with regards to Defendant Parsons' deliberate indifference to Plaintiff's safety, Defendant Parsons' Motion for Summary Judgment on Plaintiff's Eighth Amendment claim will be denied.

**(4)** **Qualified Immunity**

Defendant Parsons is not entitled to qualified immunity with regards to Plaintiff's remaining Eighth Amendment claim.

It has long been established that prison officials have a duty to protect inmates from a substantial and known risk of harm, including harm inflicted by other prisoners. See Farmer, 511 U.S. at 833. Questions of fact exist with regards to whether Defendant Parsons violated Plaintiff's clearly established rights as set forth in the preceding section, and therefore, the Court cannot determine at this time whether Defendant Parsons' actions were objectively reasonable. See generally Vathekan v. Prince George's Cty., 154 F.3d 173, 180 (4th Cir. 1998) ("summary judgment on qualified immunity grounds is improper as long as there remains any material factual dispute regarding the actual conduct of the defendants."). Therefore, the Court will deny Defendant Parsons' Motion for Summary Judgment on the grounds of qualified immunity. See, e.g., Newkirk v. Enzor, 674 Fed. Appx. 276 (4th Cir. 2017) (affirming denial of summary judgment on qualified immunity where facts remained in dispute).

Therefore, Defendant Parsons' Motion for Summary Judgment on the basis of qualified

immunity is denied.

## IV.    CONCLUSION

In sum, for the reasons stated herein, Defendants' Motion for Summary Judgment is denied on Plaintiff's Eighth Amendment claim against Defendant Parsons, but is granted in favor of Defendants Harrington, Mauldin, and Parsons in all other respects.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion for Summary Judgment, (Doc. No. 65), is **DENIED** as to Defendant Parsons on Plaintiff's Eighth Amendment claim, and is **GRANTED** as to Defendants Harrington, Mauldin, and Parsons on all other claims.

2. The Clerk of Court is instructed to terminate Defendants Harrington and Maudlin as parties to this action.

Signed: February 26, 2018

Frank D. Whitney
Chief United States District Judge